# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS

* * * * * * * * * * * * * * * * * * * *
DEBRA L. DUDA,                    *
                                  *
        Petitioner,               *   No. 19-31V
                                  *   Special Master Christian J. Moran
v.                                *
                                  *   Filed: August 10, 2021
SECRETARY OF HEALTH               *
AND HUMAN SERVICES,               *   Onset, shoulder injury
                                  *
        Respondent.               *
* * * * * * * * * * * * * * * * * * * *

Mark T. Sadaka, Mark T. Sadaka, LLC, Englewood, NJ, for petitioner;
Lara Englund, United States Dep't of Justice, Washington, DC, for respondent.

### FACT RULING REGARDING ONSET[1]

      Ms. Duda alleges a flu vaccine given to her on December 6, 2017 caused her to suffer adhesive capsulitis. Pet., filed January 4, 2019. The parties dispute when Ms. Duda began having shoulder problems. Preponderant evidence supports a finding that Ms. Duda's shoulder pain began on January 10, 2018 at a relatively mild level and increased in intensity on January 18, 2018.

---

[1] The E-Government Act of 2002, Pub. L. No. 107-347, 116 Stat. 2899, 2913 (Dec. 17, 2002), requires that the Court post this ruling on its website. Anyone will be able to access this ruling via the internet (https://www.uscfc.uscourts.gov/aggregator/sources/7). Pursuant to Vaccine Rule 18(b), the parties have 14 days to file a motion proposing redaction of medical information or other information described in 42 U.S.C. § 300aa-12(d)(4). Any redactions ordered by the special master will appear in the document posted on the website

Procedural History

Represented by Mark Sadaka, Ms. Duda initiated her case on January 4, 2019.[2]  With her petition, Ms. Duda submitted some medical records.  The case was assigned to the Special Processing Unit.  Ms. Duda filed more medical records on July 9, 2019, and a statement of completion on the same day.

The Secretary disputed Ms. Duda's entitlement to compensation.  Although the petition did not assert a shoulder injury related to vaccine administration ("SIRVA"), the Secretary indicated that Ms. Duda did not qualify because the evidence did not support a finding that her shoulder problem began within 48 hours of the vaccination.  The Secretary also found the evidence insufficient to establish an off-Table claim for adhesive capsulitis.  Resp't's Rep., filed Dec. 12, 2019.  The Secretary's report prompted an assignment outside of the Special Processing Unit.  Order, issued Jan. 22, 2020.

Ms. Duda addressed possible sources of information about her activities in December 2017 through March 2018, via an affidavit.  For example, Ms. Duda disclosed she communicated with a facility whose personnel treated her via a MyChart patient portal, Fairview Health.  However, when Ms. Duda attempted to retrieve these messages, the posts had been deleted.  Exhibit 16 (Pet'r's Aff., dated Mar. 16, 2020), at ¶ 3.

Ms. Duda also submitted entries to her Facebook account.  Exhibits 17-19, 24.  She also filed records from two employers: Graphic Systems (exhibit 20) and Lifetime Fitness (exhibit 21).  Later, Ms. Duda submitted affidavits from witnesses discussing her condition.  Exhibits 22-23.

Once the documentary record appeared complete, the parties were directed to answer specific questions regarding onset.  Order, issued Sep. 2, 2020.  Ms. Duda responded via an affidavit.  Exhibit 26.  The Secretary submitted a status report on November 12, 2020.

A hearing was held on March 18, 2021.  Witnesses included a chiropractor who treated Ms. Duda before and after the flu vaccination (James Anderson), a business colleague of Ms. Duda (Melissa Belschner), and Ms. Duda.  Following

---

[2] Ms. Duda does not allege that the flu vaccine caused her to suffer a shoulder injury related to vaccine administration.  See Pet.; see also Resp't's Rep., filed Dec.12, 2019, at 5.

2

the hearing, Ms. Duda was directed to pursue the patient portal message via a subpoena. Orders, issued April 21, 2021; June 22, 2021.

A subpoena facilitated the production of additional material from Fairview Health, namely, electronic messages from and to Ms. Duda and medical personnel at Fairview Health. Exhibit 29. With the submission of those additional statements, the issue is ripe for adjudication.

## Standards for Adjudication

Petitioners are required to establish their cases by a preponderance of the evidence. 42 U.S.C. § 300aa–13(a)(1). The preponderance of the evidence standard requires a "trier of fact to believe that the existence of a fact is more probable than its nonexistence before [he] may find in favor of the party who has the burden to persuade the judge of the fact's existence." Moberly v. Sec'y of Health & Human Servs., 592 F.3d 1315, 1322 n.2 (Fed. Cir. 2010) (citations omitted).

The process for finding facts in the Vaccine Program begins with analyzing the medical records, which are required to be filed with the petition. 42 U.S.C. § 300aa–11(c)(2). Medical records that are created contemporaneously with the events they describe are presumed to be accurate. Cucuras v. Sec'y of Health & Human Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993). However, medical records may not always list all problems a person is experiencing. See Kirby v. Sec'y of Health & Human Servs., 997 F.3d 1378, 1382 (Fed. Cir. 2021).

Pursuant to these standards for determining when events did or did not happen, the undersigned finds how the evidence preponderates. In setting forth the findings, the undersigned also cites to the primary evidence that is the basis for the finding. The undersigned recognizes that not all evidence is entirely consistent with these findings. See Doe 11 v. Sec'y of Health & Human Servs., 601 F.3d 1349, 1355 (Fed. Cir. 2010) (ruling that the special master's fact-finding was not arbitrary despite some contrary evidence). Indeed, it is the presence of inconsistent evidence that dictated a proceeding to resolve factual disputes.

## Summary of Evidence

Ms. Duda was born in 1960. Exhibit 15 ¶ 1. At the time of her vaccination, Ms. Duda was working primarily at Graphic Systems. Exhibit 20 (employment file); Tr. 81, 113-15. She also worked a second job at Lifetime Fitness. Exhibit 21 (employment file); Tr. 81, 116-17. Ms. Belschner sometimes supervised Ms. Duda's work at Lifetime Fitness. Tr. 44-47. Ms. Duda's employment at Lifetime

3

Fitness facilitated her exercising four to five times per week. Exhibit 16 at 3; see also Tr. 112.

Ms. Duda was in good health. She episodically saw a chiropractor, James Anderson, beginning in 2013. In the appointment closest in time before the vaccination, Ms. Duda told chiropractor Anderson about upper back and neck pain. Exhibit 8 at 18 (July 21, 2017). Ms. Duda did not know whether she had routine gynecological appointments before the vaccination. Tr. 118.

On December 6, 2017, Ms. Duda had an appointment at Fairview Clinic. While Fairview Clinic has multiple locations, Ms. Duda visited the one close to her home. Tr. 99-100. The doctor who saw Ms. Duda was Dr. Hedtke. The reasons for the appointment were a checkup and to receive the flu shot. Exhibit 3 at 16; Tr. 84.

During this appointment with Dr. Hedtke, Ms. Duda complained about "Chest pain on exertion." Exhibit 3 at 16. Her family history included cerebrovascular disease in both her mother and father. Id. at 18. Ms. Duda's oral testimony brought out additional details regarding her family history. Tr. 80.

In Ms. Duda's oral testimony, she stated she communicated information to Dr. Hedtke about her concern for a stroke in an email (or message through the patient portal) a few days after the December 6, 2017 appointment. Tr. 84, 87-89. Ms. Duda further asserted that in this same electronic communication, she informed Dr. Hedtke that she was having shoulder pain. Tr. 100-02. The records, do not document any messages or visits to Dr. Hedtke shortly after December 6, 2017.[3]

However, as artfully demonstrated on cross-examination, Ms. Duda's testimony about sending an electronic message a few days after her appointment on December 6, 2017, prompting Dr. Hedtke to explore the possible causes of her chest pain, was not accurate. See Tr. 101-02. Dr. Hedtke did not need Ms. Duda to communicate details about her concern about a cardiovascular problem via an electronic message because Ms. Duda raised those concerns during the December 6, 2017 appointment. Dr. Hedtke's December 6, 2017 record indicates Dr. Hedtke

---

[3] After the December 6, 2017 appointment, the records show that Ms. Duda next sent a message to Dr. Hedtke on February 5, 2018, relating to her shoulder problem.

ordered an echocardiogram with exercise stress test. Exhibit 3 at 19. Dr. Hedtke also ordered a mammogram.[4]

Of these two referrals, the mammogram happened earlier – on December 16, 2017. Exhibit 3 at 26. Ms. Duda testified that although her left shoulder was sensitive and in pain during the mammogram, no one examined her, tested her range of motion, or asked about other problems. Tr. 85.

The next medical appointment was for the echocardiogram on December 26, 2017. Exhibit 10 at 25-41; Tr. 86. The echocardiogram record does not memorialize that Ms. Duda complained about shoulder pain, which, according to her testimony, she was experiencing by December 26, 2017. Again, Ms. Duda discounts the value of the echocardiogram as a basis for determining when her shoulder pain began because no one examined her in conjunction with the echocardiogram. Tr. 90-91.

By the time Ms. Duda had the echocardiogram on December 26, 2017, she was, according to her testimony, having difficulty performing her jobs due to shoulder pain. At Graphic Systems, she had trouble carrying boxes. Tr. 127. At Lifetime Fitness, she could not fold the towels. Tr. 125-27. Ms. Belschner concurred that folding towels was problematic for Ms. Duda. Tr. 47-50, 70. However, Ms. Duda did not seek any medical attention for shoulder problems in late December 2017 or early January 2018.

Ms. Duda first sought medical treatment for her shoulder on January 29, 2018. Then, Ms. Duda reported "new and relatively intense pain on the left side of the upper back and neck into the left shoulder and arm" to her chiropractor (Dr. Anderson). Exhibit 8 at 19.[5]

---

[4] The patient portal messages, which were submitted after the hearing, show that Ms. Duda communicated a concern about her mother's stroke in February 2015, more than two years before December 2017. Exhibit 29 at 25.

The scope of the patient portal messages includes topics such as a request for a refill of a prescription for antibiotics. Id. at 17-19. This contradicts Ms. Duda's testimony that she used the patient portal only one time. Tr. 101.

The collection of patient portal messages also did not include any message from around December 6, 2017. The absence of a record for this date diminishes the accuracy of Ms. Duda's testimony that she communicated with Dr. Hedtke electronically shortly after the vaccination.

[5] Ms. Duda's decision to consult a chiropractor, rather than Dr. Hedtke, was not explained well. Ms. Duda maintained that she and Dr. Hedtke had a falling out because of how Dr. Hedtke responded to Ms. Duda's concern about a stroke. Tr. 91, 96. Yet, Ms. Duda also acknowledged

Dr. Anderson holds a degree in chiropractic studies. Exhibit 28 (curriculum vitae). He has practiced chiropractic medicine since 1996. He owned (and still owns) City Lakes Chiropractic, in Minneapolis, Minnesota. Dr. Anderson typically saw about 40 patients per day, Tr. 28, and created records about the patient's subjective complaints, his objective findings, his assessment, and his plan of care. Tr. 9-10, 28-30.

While Dr. Anderson's January 29, 2018 record notes that Ms. Duda's shoulder pain was "new," the medical record provides no other information about the date of onset. Tr. 21. The shoulder pain was "new" because the onset happened after the most recent visit, which was on July 21, 2017. Tr. 10, 22. In the objective portion of his note, Dr. Anderson described Ms. Duda as being in obvious distress and exquisite discomfort. Exhibit 8 at 19; accord Tr. 11. In Dr. Anderson's words, the pain had "developed a personality." Tr. 22. When asked how long it takes for pain to develop a personality, Dr. Anderson answered that absent a traumatic injury, "it's not uncommon for symptoms to develop over a period of weeks or months." Tr. 30-31.

Upon learning of the nature of Ms. Duda's complaints, Dr. Anderson was "concerned about the potential for cardiac involvement." Exhibit 8 at 19. However, Ms. Duda appears to have assured Dr. Anderson by advising him that her recent echocardiogram was negative. Nevertheless, Dr. Anderson recommended an evaluation at an urgent care facility or emergency department. Exhibit 8 at 19. Dr. Anderson also treated Ms. Duda with chiropractic manipulation.

In the following week, Ms. Duda appears to have performed her usual activities. She did not take any leave from Graphic Systems. See exhibit 20 at 117. She also made crafts and jewelry. See exhibit 18 (Facebook posts).

Ms. Duda return to Dr. Anderson on February 5, 2018. She again complained about pain in her left shoulder, arm, upper back, and neck. Exhibit 8 at 21. These complaints were quite similar to her previous problems. Tr. 16. Dr. Anderson measured her blood pressure, which was high. Like at the previous visit, Dr. Anderson recommended Ms. Duda go to urgent care. But, unlike the previous recommendation, Ms. Duda followed Dr. Anderson's advice. Tr. 94.

---

that Dr. Hedtke took her worry about a possible stroke seriously by ordering an echocardiogram. Tr. 96.

Ms. Duda went to Apple Valley Medical Urgent Care on February 5, 2018. Ms. Duda presented with "shoulder pain left." Exhibit 5 at 2. She informed the doctor at that facility, Dr. Schultz, that "[t]he pain initially started 2 ½ weeks ago. There was no obvious precipitating injury." Id. Critically, the report that Ms. Duda's shoulder pain started 2.5 weeks earlier is the first notation in the medical record that provides information about the duration or onset of Ms. Duda's shoulder pain. Based on this record, Ms. Duda's shoulder pain started approximately January 18, 2018.

In Ms. Duda's oral testimony, she seemed to challenge the accuracy of this note in two respects. First, Ms. Duda questioned the professionalism of Dr. Schultz. Tr. 95-97. Second, Ms. Duda maintains that the phrase "2.5 weeks earlier" refers to the time her shoulder problem worsened. Tr. 96-97.

Dr. Schultz ordered a chest x-ray, which did not show any abnormalities. Exhibit 5 at 10. Upon examination, he documented "pain with range of motion in: left shoulder adduction, abduction, and internal rotation; pain appears muscular." Id. at 3. Dr. Schultz prescribed a medication, Flexeril, to relax her muscles. Id. at 4.

Later on February 5, 2018, Ms. Duda used Fairview Health's patient portal to update Dr. Hedtke. Ms. Duda wrote: "I have developed a burning dull ache in my left shoulder over the last couple of weeks." Ms. Duda added: "The pain has been gradually getting worse over the last 2 weeks - started out as an annoyance when I was working out at the gym, now [it is] a constant." Exhibit 29 at 9.

The following day, February 6, 2018, Ms. Duda informed people who had access to her Facebook posts that she got pain medication for her shoulder. Exhibit 18 at 29; see also exhibit 19 at 2. Ms. Duda posted about her shoulder injury on Facebook again on February 19, 2018. In that entry, she stated, "I have had severe pain in [my] shoulder that has been ongoing since Jan[uary] . . . ." Exhibit 18 at 23; see also exhibit 17 at 6; exhibit 19 at 9; Tr. 132. In response to her Facebook post, at least two people communicated that they had a similar experience. Exhibit 19 at 9; see also exhibit 29 at 7.

After Ms. Duda's Facebook posts, she asked Dr. Hedtke, via the Fairview Health patient portal on February 20, 2018, whether other people have contacted Fairview Health about having shoulder problems following vaccinations. Ms. Duda also detailed her present condition and recent history in this lengthy communication to Dr. Hedtke. Ms. Duda recounted that a co-worker had experienced "the same EXACT symptoms." Exhibit 29 at 7 (capitalization in

7

original). These symptoms included: "shoulder burn almost like the muscle were shredded," "[s]hooting dull ache going up the neck and in between the shoulder between the vert[e]brae," an inability to lift arms over their heads, a worsening of pain at night, and "occasional numbing or prickle effects going down our arms." Id.

In this message, Ms. Duda also provided information about the chronology. She stated that her co-worker and she "both got our flu shots around the same time late Dec[ember], conditions started out slowly the first weeks of Jan[uary] and progressively got worse." Id. at 7. Ms. Duda stated that she had gotten a flu shot in "late Dec."[6]

In the same February 20, 2018 patient portal message, Ms. Duda further recounted that her co-worker and she had searched the internet and "found that there is a neurologic effect caused by the flu shot that [is called] Brachial Neuritis which fits both our symptoms to a T!" Exhibit 29 at 7. Ms. Duda questioned Dr. Hedtke whether her shoulder pain could come from a physical activity, such as shoveling snow as Dr. Schultz from the Apple Valley Urgent Care had suggested,[7] or whether her shoulder pain could come from flu shot. Id. at 8.

Ms. Duda completed her message by telling Dr. Hedtke that she had seen a chiropractor twice, visited a masseuse, and gone to the emergency room in Apple Valley. She planned to try an acupuncturist "tonight." Id.

Starting on February 20, 2018, Ms. Duda sought assistance from an acupuncturist. However, the treatment records do not document when her shoulder pain began. See exhibit 2 at 1-2.

Although the electronic record is not entirely clear, it appears that Dr. Hedtke reviewed Ms. Duda's February 20, 2018 patient portal message on February 23, 2018. Dr. Hedtke's internal note states: "Not likely from the flu shot. Suggest follow up with me or sports med." Exhibit 29 at 6. A nurse, in turn, told Ms. Duda that Dr. Hedtke had reviewed the message and wanted Ms. Duda to

---

[6] This is inaccurate. The date of Ms. Duda's vaccine was December 6, 2017, not late December. Exhibit 7 at 1.

[7] The record from Dr. Schultz does not mention snow shoveling. See exhibit 5 at 2-5. However, Dr. Schultz could have spoken to Ms. Duda about this possibility without necessarily memorializing it in his medical record.

schedule an appointment.  Exhibit 29 at 7.  Ms. Duda did not schedule a follow up appointment with Dr. Hedtke.  Tr. 100.[8]

Via Facebook, Ms. Duda informed people that she contacted an attorney regarding a potential claim in the Vaccine Program.  Exhibit 19 at 17.  Accordingly, before the hearing, Ms. Duda was ordered to be prepared to state when she first contacted an attorney.  Order, issued Feb. 24, 2021 (citing In re Dayco Corp. Derivative Sec. Litig., 102 F.R.D. 633, 635 (S.D. Ohio 1984)).  Although Ms. Duda could not answer questions when she first communicated with an attorney, Tr. 133, Mr. Sadaka represented that his firm possesses an email from Ms. Duda dated February 28, 2018.  Tr. 145.

In early March, Ms. Duda attempted to get more help with her ongoing shoulder pain.  She reached out to her Facebook community, requesting a referral for an orthopedic surgeon.  In this context, Ms. Duda stated, "I've been in pain since the end of Dec[ember]."  Exhibit 17 at 5 (March 5, 2018).

On March 6, 2018, Ms. Duda sent Dr. Hedtke another message through the patient portal.  Ms. Duda asked whether Dr. Hedtke could schedule an MRI.  Exhibit 29 at 7.

Ms. Duda returned to Dr. Anderson on March 7, 2018.  Dr. Anderson recorded that Ms. Duda is frustrated with her ongoing pain and "[s]he has difficulty doing essentially all of her everyday activities."  Exhibit 8 at 22; see also Tr. 17-19.   Dr. Anderson referred her for an MRI.  See Tr. 19; exhibit 17 at 4.

The MRI revealed two items potentially related to Ms. Duda's shoulder pain: "Minimal hypertrophic degenerative change at the acromioclavicular joint."  Also, Ms. Duda had a "Mild degenerative tendinopathy" in the supraspinatus tendon, which is part of her rotator cuff.  Exhibit 10 at 4 (March 10, 2018).

Ms. Duda next saw an orthopedic surgeon, Dr. Bengtson.  See exhibit 18 at 5.  Ms. Duda said that acupuncture had helped but massage and chiropractic care did not.  Dr. Bengtson diagnosed a rotator cuff tendinopathy, referred her to physical therapy, and gave her a cortisone shot.  Exhibit 1 at 3-4.

---

[8] In this portion of Ms. Duda's testimony on cross-examination, she accurately stated that she did not "see" Dr. Hedtke after the December 6, 2017 visit.  Her testimony left the impression that shortly after December 6, 2017, her relationship with Dr. Hedtke ended.  However, Ms. Duda did not disclose that after the December 6, 2017 appointment, she communicated with Dr. Hedtke via the patient portal.

9

Ms. Duda stated that before she saw Dr. Bengtson, her shoulder pain was more than a 10 on a scale of 1–10.  After this cortisone shot, the pain improved to a 7-8.  Tr. 135; see also exhibit 17 at 2 (Facebook post on March 20, 2018, noting the pain was better but not completely gone).  In the March 20, 2018 Facebook post, Ms. Duda also stated she had "a frozen shoulder due to getting the flu shot!"  Exhibit 17 at 2.

Ms. Duda informed federal government officials about the problem she was having by submitting a VAERS report[9] on March 27, 2018.  Exhibit 14 at 1; see also exhibit 19 at 51-52.  Ms. Duda wrote that the onset was the same day as her vaccination, December 6, 2017.  Id.  When asked how she knew to submit a VAERS report, Ms. Duda did not recall.  Tr. 136.

The information Ms. Duda gave in the VAERS report is similar to the content of another patient portal message to Dr. Hedtke, which Ms. Duda also created on March 27, 2018.  This message begins: "Ever since I received that flu shot in Dec[ember,] I have had a pain that has substantially gotten worse over time. It started out as a burn and has ended up in a pain so severe I can barely live my life and do my job. I didn't think much of it at first but it started out burning - I [thought] it was normal.  Then the burning aches started to spread."  Exhibit 29 at 5.  Ms. Duda also declared: "It started when I got my flu shot."  Id.  Ms. Duda explained that she wanted to warn other people and to make sure that Dr. Hedtke "kn[e]w my situation and the cause of this injury."  Id.

Ms. Duda began the physical therapy to which Dr. Bengtson had referred her on March 28, 2018.  She told her physical therapist that the onset of her shoulder pain was December 6, 2017.  Ms. Duda was having problems "lifting arm up, carrying anything."  She rated her pain as 6/10 that day but 10/10 in the prior week.  Exhibit 4 at 17-19.

On April 6, 2018, Ms. Duda returned to Dr. Anderson.  Dr. Anderson recorded that her shoulder pain began after vaccination.  Exhibit 8 at 23.  Dr. Anderson testified he noted this onset because in January, they were trying to figure out the source of the problem.  Tr. 38.

---

[9] VAERS, the Vaccine Adverse Event Reporting System, allows people to inform the Centers for Disease Control and Prevention as well as the Food and Drug Administration that they experienced a health problem after receiving a vaccination.  See www.vaers.hhs.gov (last visited August 5, 2021).

10

After this appointment, other visits to medical professionals become relatively less relevant in determining when shoulder pain began. Ms. Duda completed physical therapy on April 27, 2018 (exhibit 4 at 26) and acupuncture on June 9, 2018 (exhibit 2 at 2). At both places, her shoulder pain was described as "improving."

Ms. Duda saw Dr. Bengtson in follow-up on June 12, 2018. The nurse's note records that Ms. Duda is "[h]ere for left shoulder pain since Dec[ember]." Dr. Bengtson diagnosed her with adhesive capsulitis, gave a second cortisone shot, and prescribed a home exercise program. Exhibit 4 at 3-4.

In early 2020, Ms. Duda moved to Florida. Exhibit 23 ¶ 3; Tr. 136-38. She is not experiencing any pain in her shoulder now. Tr. 139-42.

Analysis

The primary dispute concerns the value of records created most close in time with petitioner's vaccination. On one hand, the earlier relevant records suggest that the shoulder pain started in mid-January 2018. On the other hand, other later records indicate her shoulder pain started in December 2017, perhaps within 48 hours of the December 6, 2017 flu vaccination. A secondary point of contention concerns the value of testimony from witnesses about those records.

The two strongest points of evidence regarding the onset of shoulder pain are both from February 5, 2018. The first is the report from Dr. Schultz at Apple Valley Urgent Care. In this report, Dr. Schultz memorializes Ms. Duda's statement that her shoulder pain started "2.5 weeks ago." Two or three weeks is, in the undersigned's experience, not much time to wait to see a doctor for a non-traumatic shoulder injury. See Cooper v. Sec'y of Health & Human Servs., No. 16-1387V, 2018 WL 1835179, at *6 (Fed. Cl. Spec. Mstr. Jan. 18, 2018) ("the undersigned does not find a delay in treatment of several months to be dispositive in and of itself regarding the question of onset in a SIRVA case such as this"). Ms. Duda reported when the shoulder injury began close in time to when the problem apparently stated, making the February 5, 2018 report contemporaneous. Ms. Duda also made this statement in the context of seeking medical treatment. Thus, according to the rebuttable presumption afforded in Cucuras, the report is accurate.

The second very strong piece of evidence is Ms. Duda's February 5, 2018 patient portal message to Dr. Hedtke. Ms. Duda wrote: "I have developed a burning dull ache in my left shoulder over the last couple of weeks." Ms. Duda added: "The pain has been gradually getting worse over the last 2 weeks - started

11

out as an annoyance when I was working out at the gym, now [it is] a constant." Exhibit 29 at 9. This report, too, is presumptively correct. Cucuras.

These two February 5, 2018 reports to two different medical doctors are relatively consistent and the consistency strengthens their evidentiary value. In one, Ms. Duda's pain began "2 ½ weeks ago." Exhibit 5 at 2. In the other, the pain developed over the last couple of weeks and became worse over time. Exhibit 29 at 9. Together, these reports support a finding the Ms. Duda's shoulder pain began on January 10, 2018, and worsened over time and became more severe pain approximately January 18, 2018.

A finding that Ms. Duda's severe shoulder pain started two and a half weeks before February 5, 2018 (or on January 10 and worsened by January 18, 2018) is consistent with Ms. Duda's January 22, 2018 Facebook post. She stated, "my shoulder is feeling the pain and it burns!" Exhibit 18 at 47. Before this January 22, 2018 entry, Ms. Duda had not described any shoulder problem to her Facebook community. Thus, the January 22, 2018 Facebook post implies that Ms. Duda's injury was of such intensity that it merited a Facebook post.

The two February 5, 2018 reports are reinforced, to some degree, by some of Ms. Duda's other Facebook posts. In a February 19, 2018 Facebook post, she stated "I have had severe pain in shoulder that has been ongoing since Jan[uary]." Exhibit 18 at 23. Ms. Duda's description of "severe pain" buttresses the finding that *mild* pain started earlier and *severe* pain started later. Similarly, in a March 20, 2018 Facebook post, Ms. Duda stated that her pain has been "flaring up the first week of january." Exhibit 19 at 17.

These reports stand in contrast with later records that place Ms. Duda's shoulder pain in early December immediately after her December 6, 2017 vaccination. Examples include Ms. Duda's March 27, 2018 VAERS report (exhibit 14); Ms. Duda's March 27, 2018 patient portal message (exhibit 29 at 5); Ms. Duda's April 6, 2018 report to Dr. Anderson (exhibit 8 at 23); and Ms. Duda's June 12, 2018 history to Dr. Bengtson's nurse (exhibit 4 at 3-4). Another example is Ms. Duda's January 23, 2019 affidavit. Notably, Ms. Duda gave these histories after she began to suspect she might have a claim in the Vaccine Program. Judicial officers have long recognized that participation in litigation may impair the accuracy of a person's memory. Reusser v. Sec'y of Health & Human Servs., 28 Fed. Cl. 516, 523 (1993) ("written documentation recorded by a disinterested person at or soon after the event at issue is generally more reliable than the recollection of a party to a lawsuit many years later"); Mueller v. Sec'y of Health & Human Servs., No. 06–775V, 2011 WL 1467938, at *9 (Fed. Cl. Spec. Mstr. Mar.

16, 2011) ("Memories are generally better the closer in time to the occurrence reported and when the motivation for accurate explication of symptoms is more immediate."); Thelen v. Sec'y of Health and Human Servs., No. 90-22V, 1991 WL 38084, at *11 (Fed. Cl. Spec. Mstr. Mar. 6, 1991) (stating that the pressures of litigation may affect memory).

In addition, Ms. Duda's conduct in December and January seems not in accord with a person who was suffering a shoulder injury. She, as discussed earlier, managed to work two different jobs. She also took a three-day vacation to San Antonio, Texas, which involved riding in a car for at least 14 hours. See exhibit 18 (Facebook posts) at 80-84; Tr. 120-21. On December 22, 2017, she machine-sewed mermaid blankets as holiday presents for a charity. Exhibit 18 at 75; Tr. 123.

To be sure, Ms. Duda's activities are open to more than one interpretation. She stated she performed her jobs with assistance. She stated she drove very little on the trip from San Antonio. She stated she operated her sewing machine with only one hand.

In this vein, Ms. Belschner's testimony supports Ms. Duda's assertion that she was having shoulder pain by Christmas. Tr. 46-51, 62, 74. The problem, however, is that Ms. Belschner's 2021 oral testimony was about events happening in December 2017, more than three years earlier. Simply due to the passage of time, Ms. Belschner's recollection may be less accurate. Mueller, 2011 WL 1467938, at *9 (stating "the logical fact" that "memories fade with the passage of time"); Velchek v. Sec'y of Health & Human Servs., No. 02–1479V, 2005 WL 2847451, at *17 (Fed. Cl. Spec. Mstr. Oct. 28, 2005) (recognizing "the passage of time dulls memories" and accordingly assigning greater weight to contemporaneous records).

Overall, some evidence correlates with the allegation that Ms. Duda's shoulder pain began in December 2017, although when in December is more difficult to say. For example, a March 5, 2018 Facebook post says, "pain since end of Dec[ember]." Exhibit 17 at 5. However, the evidence that indicates Ms. Duda's shoulder pain started in mid-January 2018 is weightier. Accordingly, the undersigned finds that Ms. Duda's shoulder pain started January 10, 2018.

January 10, 2018 is 35 days (five weeks) after the December 6, 2017 vaccination. While this finding prevents Ms. Duda from establishing that she suffered SIRVA as defined in the regulations, 42 C.F.R. § 100.3(c)(10), she has not alleged she suffered SIRVA. Instead, Ms. Duda has alleged that a December 6,

2017 flu vaccination was the cause-in-fact of her adhesive capsulitis. Whether 35 days is an interval consistent with the vaccine as a cause remains an open and unexplored question in this case.

## Conclusion

For the reasons explained above, the evidence preponderates in favor of finding that Ms. Duda's shoulder pain started approximately January 10 to January 18, 2018. The parties are ordered to provide this ruling to any expert she or he retains.

A status conference is scheduled, sua sponte, for **Wednesday, September 8, at 11:00 A.M. (Eastern Time)**. The parties should be prepared to discuss potential next steps.

**IT IS SO ORDERED**.

> s/Christian J. Moran
> Christian J. Moran
> Special Master